AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Andres Felipe Alzate Bustamante,<br><br><br>_Defendant(s)_ | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  20-6484-MJ-HUNT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ September 15-30, 2020, _____ in the county of _____ Broward and Palm Beach _____ in the _____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 and 841(b)(1)(A) | Conspiracy to Possess with Intent to Distribute 5 Kilograms or More of Cocaine |
| 21 U.S.C. 841(a)(1) and 841(b)(1)(A) | Attempt to Possess with Intent to Distribute 5 Kilograms or More of Cocaine |

This criminal complaint is based on these facts:

**See attached Affidavit.**

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Joshua Passman, DEA Task Force Officer
_Printed name and title_

Sworn to before me and signed in my presence. *by telephone*

Date:  10/01/2020

_____
_Judge's signature_

City and state:     Fort Lauderdale, Florida

Patrick M. Hunt, United States Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Joshua Passman, being duly sworn, hereby state as follows:

1.      I am a Task Force Officer with the Drug Enforcement Administration ("DEA") assigned to the Miami Field Division. I have been a sworn law enforcement officer since October 2003. In December 2009, I was assigned to the Broward Sheriff's Office, Strategic Investigations Division, which is part of the High Intensity Drug Trafficking Area ("HIDTA") program. In January 2015, I was assigned to the DEA. I have received specialized training in the means and methods used by narcotics traffickers to import and distribute narcotics, drug smuggling methods, and the concealment and laundering of proceeds from illicit drug trafficking activities. I have personally conducted and participated in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions and launder drug proceeds. During the course of these investigations, I have participated in the execution of search warrant and have debriefed or participated in debriefings of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. The aforementioned investigations resulted in the arrest and prosecution of numerous individuals for narcotics violations and other violations of federal law. Based upon my training and experience, I am familiar with the manner in which narcotics-trafficking organizations operate, including the manner in which various types of illegal drugs are cultivated, manufactured, smuggled, distributed, or diverted, as well as methods used to finance drug transactions and launder drug proceeds.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516(1).

3.      I make this Affidavit in support of a criminal complaint charging **Andres Felipe Alzate**

**Bustamante** with violating Title 21, United States Code, Sections 846 (conspiracy to possess with intent

to distribute cocaine) and 841(a)(1) (attempt to possess with intent to distribute cocaine). Pursuant to

Title 21, United States Code, Section 841(b)(1)(A), it is further alleged that the violations involved five

(5) kilograms or more of cocaine.

4.      I submit this Affidavit based on my personal knowledge, as well as information provided

to me by other individuals, including other law enforcement officials, and my review of records and

other evidence obtained during the course of this investigation. Because this Affidavit is being submitted

for the limited purpose of establishing probable cause for the requested warrant, it does not include every

fact known to me about this matter.

## PROBABLE CAUSE

5.      In or around September 2020, a cooperating individual ("CI-1") who is facing possible

criminal prosecution on an unrelated matter advised that he/she had a contact in Tampa, Florida – later

identified as **Andres Felipe Alzate Bustamante** ("**Alzate Bustamante**") – who was interested in

purchasing multi-kilogram quantities of cocaine.

6.      On or about September 15, 2020, **Alzate Bustamante** met with CI-1 at the Hard Rock

Hotel in Hollywood, Florida.[1] During this meeting, which was audio recorded, CI-1 purported to have

connections with individuals involved in the importation of multi-kilogram quantities of cocaine from

The Bahamas to the South Florida. During the meeting, CI-1 introduced two individuals to **Alzate**

**Bustamante**: a cooperating individual ("CI-2") who is facing possible criminal prosecution on an

unrelated matter and a confidential source ("CS"). CI-2 and the CS posed as the boat captains who would

be transporting the cocaine from The Bahamas to South Florida. CI-2 and the CS advised **Alzate**

**Bustamante** that if he (**Alzate Bustamante**) was willing to invest money in the load prior to them

---

[1] Hollywood, Florida, is located in the Southern District of Florida.

traveling to The Bahamas, they would provide him with cocaine at a price of $16,000.00 per kilogram plus an additional $4,000.00 per kilogram for transport.[2] CI-1 told **Alzate Bustamante** that he (CI-1) would contact **Alzate Bustamante** once CI-2 and the CS were ready to make the trip. Initially, **Alzate Bustamante** expressed interest in investing $100,000.00 for 5 kilograms of cocaine.[3]

7.    In the days following the meeting, **Alzate Bustamante** and CI-1 communicated via Telegram, which is an encrypted messaging application. The following is a portion of the communication between **Alzate Bustamante** ("AB") and CI-1 that occurred on or about September 21, 2020:

CI-1:   Keep you posted later today.
AB:     Ok lmk I'm ready
CI-1:   5th street?
AB:     Yeah
AB:     Today, tomorrow? Lmk so I can plan the next couple of days
AB:     Got people waiting keep me posted
CI-1:   I'm on it, weather really sucks

In the above conversation, "5th Street" is a code word that CI-1 and **Alzate Bustamante** agreed to use to confirm the previously agreed-upon amount. Here, by responding affirmatively to the question "5th Street," **Alzate Bustamante** is confirming that he still intends on purchasing five (5) kilograms of cocaine.

8.    On or about September 27, 2020, CI-1 and **Alzate Bustamante** exchanged the following texts:

CI-1:   Almost papa
CI-1:   This week I know you have people waiting
AB:     Yeah I do my brother plz make sure it's good a lot of my people like to cook the meat

Your affiant believes that the statement "cook the meat" refers to **Alzate Bustamante** telling CI-1 that his buyers like to cook the cocaine and convert it into crack cocaine.

---

[2] Based on my training and experience, the structure of this deal is consistent with similar deals where an individual provides money up front for cocaine that will ultimately be purchased in The Bahamas.
[3] At a cost of $16,000 per kilogram, five kilograms would cost $80,000. With an additional transportation fee of $4,000 per kilogram, the total 5 kilograms would cost $20,000 in transportation. In total, this would be $100,000.

9.      On or about September 28, 2020, CI-1 directed **Alzate Bustamante** to meet with him/her on the following day. **Alzate Bustamante** agreed.

10.     On or about September 29, 2020, CI-1 directed **Alzate Bustamante** to meet him at the Town Center Mall in Boca Raton, Florida.[4] At approximately 1:15 p.m., **Alzate Bustamante** advised CI-1 that he was arriving in a Honda Accord, white in color. At the time of **Alzate Bustamante**'s arrival, law enforcement attempted to locate the vehicle in question; however, they were unable to do so. A short time later, **Alzate Bustamante** directed CI-1 to meet him at a different location, advising that he was standing in front of the mall. CI-1 picked up **Alzate Bustamante** from this location. At the time of their encounter, **Alzate Bustamante** was carrying a black duffel bag with white lettering as well as a small fanny pack. Upon entering CI-1's vehicle, **Alzate Bustamante** advised CI-1 that he was in possession of the $100,000.00. CI-1 called CI-2 and an undercover detective ("UC") who were waiting at a nearby location to come over to the vehicle to participate in the meeting. CI-2 and the UC entered the vehicle, and sat in the back seat while **Alzate Bustamante** sat in the front passenger seat. During the meeting, **Alzate Bustamante** made several phone calls to someone that **Alzate Bustamante** referred to as an "investor" while discussing the logistics of the pending deal. **Alzate Bustamante** told CI-1 that his coconspirators had additional money with them to purchase additional kilograms of cocaine; however, they did not feel comfortable leaving it with CI-1. CI-2 advised **Alzate Bustamante** that the additional money had to provided up front prior to the purported trip or the cost of additional kilograms of cocaine would be higher. **Alzate Bustamante** then proceeded to remove approximately $100,000.00 from the duffel bag and hand it to CI-2. **Alzate Bustamante** kept the duffel bag with him because it contained additional money within it, which law enforcement suspected belonged to the unidentified co-conspirators **Alzate Bustamante** called during the meeting. While these discussions were taking place,

---

[4] Boca Raton, Florida, is located in the Southern District of Florida.

**Alzate Bustamante** asked CI-2 and the UC if there was a smaller bag in the backseat. The UC noticed CI-2 was sitting on a black fanny pack which the UC retrieved. Upon picking up the bag, the UC was able to feel what the UC identified as a midsize semiautomatic handgun. As the UC handed the bag to **Alzate Bustamante**, the UC asked, "Oh, you got your heater in there?" The use of the word "heater" was in reference to the firearm. **Alzate Bustamante** answered in the affirmative. The UC proceeded to hand the bag to **Alzate Bustamante**. This meeting was audio/video recorded. Following the meeting, your affiant took custody of the currency which was placed into evidence. After the meeting, law enforcement conducted surveillance on **Alzate Bustamante** after he departed the meeting. Law enforcement observed **Alzate Bustamante** meet with two males inside of the mall before following them to a Honda Accord, white in color, bearing Florida tag HVKQ91. All three subjects entered the vehicle and departed the location at which time surveillance was terminated. A check of the vehicles tag showed the vehicle was registered to D.G.

11.    On or about September 29, 2020, after law enforcement had terminated their surveillance (see Paragraph 10), **Alzate Bustamante** advised CI-1 that he would be staying at the Hard Rock Hotel in Hollywood, Florida, to await the arrival of the cocaine. Later in the evening, CI-1 met with **Alzate Bustamante** at the hotel at which time **Alzate Bustamante** stated that he would have more money on the following day in order to purchase an additional 5 kilograms of cocaine.

12.    On or about September 30, 2020, CI-1 advised **Alzate Bustamante** that the load had arrived. CI-1 subsequently drove to the Hard Rock Hotel in Hollywood, Florida, and picked up **Alzate Bustamante.** Afterwards, CI-1 drove **Alzate Bustamante** to the designated meeting location, that is, the parking lot of the Bass Pro Shops, 200 Gulf Stream Way, Dania Beach, Florida. Upon arriving at the meeting location, CI-1 exited the vehicle and met with CI-2 and the UC, both of whom were waiting in a nearby vehicle. CI-1 retrieved a backpack containing sham kilograms of cocaine. CI-1 proceeded to carry the backpack back to CI-1's vehicle, where **Alzate Bustamante** was waiting. CI-1 provided the

backpack to **Alzate Bustamante**. While **Alzate Bustamante** opened one of the bags, CI-1 walked back to the UC's vehicle. At that time, law enforcement converged on CI-1's vehicle and took **Alzate Bustamante** into custody. Agents subsequently located the Honda Accord, white in color, bearing Florida tag HVKQ91 in the valet area of the Hard Rock Hotel. At that time, law enforcement located D.G. and a third subject ("R.K."), both of whom were with **Alzate Bustamante** on the previous day. At the time, R.K. was carrying a duffel bag similar in appearance to the one that **Alzate Bustamante** used to transport the $100,000.00 to CI-1, CI-2, and the UC during the September 29, 2020, meeting.

13.     Your affiant spoke to **Alzate Bustamante** in an attempt to gain Alzate Bustamante's cooperation. Your affiant told **Alzate Bustamante** that no promises could be made regarding his potential cooperation; however, **Alzate Bustamante** indicated a willingness to cooperate. While speaking with **Alzate Bustamante**, your affiant observed multiple text messages and missed calls from a contact on the locked screen of **Alzate Bustamante**'s phone. One such message read "Yo everything good?" I asked **Alzate Bustamante** if he needed to speak with the individual in question in order to preserve his ability to proactively cooperate with law enforcement. **Alzate Bustamante** answered in the affirmative. While on the call, **Alzate Bustamante** alerted the contact – later identified as D.G. – to his arrest, prompting your affiant to take the phone away from **Alzate Bustamante**.

14.     A short time after **Alzate Bustamante** had made the call to D.G., law enforcement observed D.G. enter the white Honda Accord and depart from the hotel. R.K. remained at the hotel. A detective with the Broward Sheriff's Office followed D.G. out of the parking lot and north on Interstate 441. The detective observed D.G. make a lane change into the left turning lane without signaling, causing other motorists to brake in order to avoid a collision. At this time, the detective conducted a traffic stop on D.G.'s vehicle. Upon making contact, D.G. advised the detective that there was a gun in the trunk of the vehicle. D.G. gave consent for a search of the vehicle. Law enforcement ultimately located a black fanny pack in the trunk of the vehicle containing a loaded .45 caliber handgun. The fanny pack was

similar in appearance to the one that **Alzate Bustamante** had in his possession during the September 29, 2020, meeting. Law enforcement seized the firearm.

## CONCLUSION

15.     Based on the above information and facts, your affiant submits there is probable cause to believe that, between on or about September 15, 2020, and September 30, 2020, **Andres Felipe Alzate Bustamante** committed a violation of Title 21, United States Code, Sections 846 (conspiracy to possess with intent to distribute cocaine) (Count 1) and 841(a)(1) (attempt to possess with intent to distribute cocaine) (Count 2). Pursuant to Title 21, United States Code, Section 841(b)(1)(A), it is further alleged that the violations involved five (5) kilograms or more of cocaine.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**


_____
JOSHUA PASSMAN, TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by _telephone_ on this _1st_ day of _October,_ 2020.

_____
PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE